## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Royal W. Leith, III, on behalf of himself and all others similarly situated,<br><br>                   Plaintiff,<br><br>v.<br><br>TECUMSEH PRODUCTS COMPANY; TECUMSEH COMPRESSOR COMPANY; TECUMSEH DO BRASIL, LTDA.; TECUMSEH DO BRASIL USA, LLC; DANFOSS A/S; DANFOSS, INC.; DANFOSS COMMERCIAL COMPRESSORS, LTD.; DANFOSS SCROLL TECHNOLOGIES, LLC; DANFOSS TURBOCOR COMPRESSORS, INC.; DANFOSS COMPRESSOR, LLC; WHIRLPOOL CORPORATION; WHIRLPOOL, S.A.; EMBRACO NORTH AMERICA, INC.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; APPLIANCES COMPONENTS COMPANIES, SpA; ACC USA, LLC; EMERSON CLIMATE TECHNOLOGIES, INC.; COPELAND CORPORATION, LLC; CR COMPRESSORS LLC; SCROLL COMPRESSORS, LLC<br><br>                   Defendants. | C.A. No. 1:10-CV-10397<br><br>CLASS ACTION COMPLAINT |

## CLASS ACTION COMPLAINT

Plaintiff Royal W. Leith, III, ("Plaintiff") on behalf of himself and all others similarly situated in the Commonwealth of Massachusetts, brings this action for damages and injunctive relief under Massachusetts G.L. c. 93A against the Defendants named herein and complaining and alleging as follows:

1

## NATURE OF THE CASE

1.     This lawsuit is brought as a class action on behalf of consumers who purchased Hermetic Compressors (as further defined below), or products containing Hermetic Compressors, in the Commonwealth of Massachusetts that were manufactured by Defendants, their predecessors, or their controlled subsidiaries and affiliates during the period beginning at least January 1, 1996 through the present (the "Class Period").   Plaintiff alleges that during the Class Period the Defendants conspired to fix, raise, maintain and/or stabilize prices of Hermetic Compressors sold in the United States.   Because of Defendants' unlawful conduct, Plaintiff and other Class Members paid artificially inflated prices for Hermetic Compressors (or products containing Hermetic Compressors) and have suffered injury.

2.     In February 2009, as further detailed herein, competition authorities in the United States, the European Union, and Brazil announced coordinated antitrust investigations concerning price fixing and customer and market allocation in the Hermetic Compressors industry.

3.     Defendant Tecumseh Products Company ("Tecumseh") has requested and received conditional amnesty under the United States Department of Justice ("DOJ") Corporate Leniency Policy.   It has also entered into similar amnesty agreements in the European Union and Brazil. In exchange for amnesty, Tecumseh would have had to agree to cooperate with the authorities by admitting its complicity in the alleged conspiracy and providing information confirming the identities, roles, and activities of its co-conspirators.

4.     Pursuant to the information provided by Tecumseh, the antitrust authorities in the above-referenced jurisdictions have begun investigating the other Defendants.   The DOJ's Antitrust Division has issued grand jury subpoenas to Tecumseh and Whirlpool Corporation

("Whirlpool"), and it is investigating several of the U.S.-based Danfoss Defendants, as well as Defendant Panasonic Corporation of North America.

## JURISDICTION AND VENUE

5.      This court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiff is a citizen of a state different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs."   This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state."

6.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.   During the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in this district, a substantial part of the events giving rise to Plaintiff' claims occurred in this district, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## DEFINITIONS

7.      As used herein, "Hermetic Compressors" are devices, sealed in a welded steel casing, that utilize a piston-like mechanism to compress refrigerant gases.   When the compressed gas moves through the other components of the refrigerant system and is permitted to expand, it removes heat from its surroundings, producing a cooling effect that forms the basis for a variety of refrigeration and air conditioning products.

8.      The "Class Period" or "relevant period" means the period beginning at least January 1, 1996 through the present.

3

9.      "Person" means any individual, partnership, corporation, association, or other business or legal entity.

## PLAINTIFF

10.     Plaintiff Royal W. Leith, III is a Massachusetts resident who, on November 10, 2007 – during the Class Period – and in the state of Massachusetts, purchased a General Electric Refrigerator (Model # GTH22KBRARWW) containing a Hermetic Compressor made by one of the Defendants.   The Plaintiff has been injured by reason of the antitrust violations of Massachusetts G.L. c. 93A §2 et seq ("93A") alleged in this Complaint.

## DEFENDANTS

### The Tecumseh Entities

11.     Defendant Tecumseh Products Company ("Tecumseh Products") is a Michigan corporation headquartered in Ann Arbor, Michigan.   Tecumseh Products is a full-line, global manufacturer of Hermetic Compressors, which are typically used in residential and commercial refrigerators, freezers, dehumidifiers, window air conditioning units, residential and commercial central system air conditioners, heat pumps, and water coolers.   Tecumseh Products is one of the largest sellers of Hermetic Compressors in the U.S. market, and is also one of the largest producers globally, with production and sales operations in North and South America, Europe and Asia. Tecumseh accounts for about 25% of the U.S. Hermetic Compressor market.   During the Class Period, Tecumseh manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

4

12.     Defendant Tecumseh Compressor Company ("Tecumseh Compressor") is a Delaware corporation headquartered in Tecumseh, Michigan.   Defendant Tecumseh Compressor is a wholly-owned subsidiary of Defendant Tecumseh Products.   During the Class Period, Tecumseh Compressors manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

13.     Defendant Tecumseh do Brasil, Ltda. ("Tecumseh Brasil"), is a Brazilian corporation with its principal place of business located in Sao Carlos, Brazil.   Tecumseh Brasil is a wholly-owned subsidiary of Defendant Tecumseh Products.   Tecumseh Brasil is one of the world's largest Hermetic Compressor producers.   It operates two manufacturing facilities in Brazil with a combined annual compressor capacity of 17 million units, making Tecumseh's Brazilian operations the largest source of Hermetic Compressors sold by Tecumseh and its subsidiaries.   The Hermetic Compressors produced at Tecumseh Brasil's facilities are shipped and sold throughout the world, including the Commonwealth of Massachusetts. During the Class Period, Tecumseh Brasil manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

14.     Defendant Tecumseh do Brasil USA, LLC ("Tecumseh Brasil USA") is a Delaware limited liability company headquartered in Clinton, Michigan.   Tecumseh Brasil USA is a wholly-owned subsidiary of Defendant Tecumseh Brasil.   During the Class Period, Tecumseh Brasil USA manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

5

15. Defendants Tecumseh Products, Tecumseh Compressors, Tecumseh Brasil, and Tecumseh Brasil USA are collectively referred to herein as "Tecumseh."

**The Whirlpool Entities**

16. Defendant Whirlpool Corporation ("Whirlpool") is a Delaware corporation headquartered in Benton Harbor, Michigan. Whirlpool is a large manufacturer and seller of finished household appliances sold under its Whirlpool, Maytag, Jenn-Air, KitchenAid, Amana, Brastemp, Consul and Bauknecht brand names. Many of these finished products contain Hermetic Compressors manufactured by Whirlpool's Brazilian subsidiary, Defendant Whirlpool S.A. During the Class Period, Whirlpool manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

17. Defendant Whirlpool S.A., formerly known as Embraco S.A., ("Whirlpool S.A." or "Embraco") is a Brazilian corporation headquartered in Joinville, in the Brazilian state of Santa Catarina. Embraco is a subsidiary of Defendant Whirlpool Corporation. Embraco has been affiliated with Defendant Whirlpool since the 1950s and has been controlled by Whirlpool since 1997. Embraco has extensive compressor production facilities in Brazil, Europe and Asia, and holds an estimated 25% share of the global market for Hermetic Compressors. Embraco exports more than half the compressors produced at its Brazilian factories to foreign markets, including the Commonwealth of Massachusetts. Hermetic Compressors manufactured by Embraco are included as components of various appliances sold by Whirlpool under the brand names listed in paragraph 16 above. During the Class Period, Embraco manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

6

18.     Defendant Embraco North America, Inc. ("Embraco N.A.") is a Delaware corporation headquartered in Suwannee, Georgia. Defendant Embraco N.A. is a wholly-owned subsidiary of Defendant Embraco. Embraco N.A. is responsible for, among other things, selling Embraco products in North America.  During the Class Period, Embraco N.A. manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

**The Danfoss Entities**

19.     Defendant Danfoss A/S is a Danish corporation headquartered in Nordborg, Denmark.   Defendant Danfoss A/S is one of the largest Hermetic Compressors manufacturers in Europe.   Danfoss' Refrigeration and Air-Conditioning Division, responsible for manufacturing and selling the company's Hermetic Compressors, has extensive operations throughout the world, including a number of sales and marketing subsidiaries in the United States.   A recent Danfoss annual report states that "the USA is now the [Refrigeration and Air-Conditioning] Division's largest market," with 2007 sales of approximately $180 million.   During the Class Period, Danfoss A/S manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

20.     Defendant Danfoss, Inc. is a Delaware corporation with its principal place of business in Baltimore, Maryland.   Defendant Danfoss, Inc. is a wholly-owned subsidiary of Defendant Danfoss A/S. Danfoss, Inc. is the primary sales and marketing arm of Defendant Danfoss A/S in the United States, and serves as the headquarters for the U.S. operations of Danfoss' Refrigeration and Air-Conditioning Division. During the Class Period, Danfoss, Inc.

manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

21.    Defendant Danfoss Commercial Compressors, Ltd. ("Danfoss Commercial") is a Delaware corporation headquartered in Lawrenceville, Georgia. Defendant Danfoss Compressors is a wholly-owned subsidiary of Defendant Danfoss A/S. During the Class Period, Danfoss Commercial manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

22.    Defendant Danfoss Compressor, LLC ("Danfoss Compressor") is a Delaware limited liability company headquartered in Arkadelphia, Arkansas. Defendant Danfoss Compressor is a wholly-owned subsidiary of Defendant Danfoss A/S. During the Class Period Danfoss Compressor manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

23.    Defendant Danfoss Scroll Technologies, LLC ("Danfoss Scroll"), formerly known as Scroll Technologies, LLC, is a Delaware limited liability company headquartered in Arkadelphia, Arkansas. Defendant Danfoss Scroll is a wholly-owned subsidiary of Defendant Danfoss A/S. During the Class Period, Danfoss Scroll manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

24.    Defendant Danfoss Turbocor Compressors, Inc. ("Danfoss Turbocor") is a Delaware corporation headquartered in Tallahassee, Florida. Defendant Danfoss Turbocor is a

joint venture between Defendant Danfoss A/S and the Canadian engineering firm Turbocor, with each parent company owning a 50% stake. During the Class Period, Danfoss Turbocor manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

25.    Defendants Danfoss A/S, Danfoss, Inc., Danfoss Commercial, Danfoss Compressor, Danfoss Scroll, and Danfoss Turbocor are collectively referred to herein as "Danfoss."

**The Panasonic Entities**

26.    Defendant Panasonic Corporation ("Panasonic Corp."), which until October 2008 was known as Matsushita Electric Industrial, Ltd., is a Japanese corporation headquartered in Osaka, Japan. During the Class Period, Defendant Panasonic Corp. manufactured, marketed, sold, and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

27.    Defendant Panasonic Corporation of North America ("Panasonic N.A.") is a Delaware corporation headquartered in Secaucus, New Jersey. Defendant Panasonic N.A., which sells Hermetic Compressors in the United States through its Panasonic Industrial Company division, is a wholly-owned subsidiary of Defendant Panasonic. During the Class Period, Panasonic N.A. manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

28.    Defendants Panasonic Corp. and Panasonic N.A. are collectively referred to herein as "Panasonic."

**The ACC Entities**

29.     Defendant Appliances Components Companies S.p.A. ("ACC") is an Italian corporation headquartered in Pordeone, Italy.  ACC is Europe's largest producer of household refrigeration compressors.  During the Class Period, ACC manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

30.     Defendant ACC USA, LLC ("ACC USA") is a Delaware limited liability company headquartered in Madison, Alabama.  Defendant ACC describes ACC USA as "an ACC branch office" that operates as a "sales, engineering and distribution center in the USA."  Defendant ACC further notes that "ACC USA provides the North American market with high quality hermetic compressors."  During the Class Period, ACC USA manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

**The Emerson Defendants**

31.     Defendant Emerson Climate Technologies, Inc. ("Emerson Climate") is a Delaware corporation with its principal place of business in Sidney, Ohio.  Emerson Climate is a wholly-owned subsidiary of the publicly traded company Emerson Electric Co. During the Class Period, Emerson Climate manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

32.     Defendant Copeland Corporation, LLC ("Copeland") is a Delaware limited liability company with its principal place of business in Rushville, Indiana.  Copeland is wholly-owned by Defendant Emerson Climate. During the Class Period, Copeland manufactured,

marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

33.    Defendant CR Compressors LLC ("CR") is a Delaware limited liability company with its principal place of business in Rushville, Indiana.  CR is wholly-owned by Defendant Emerson Electric. During the Class Period, CR manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

34.    Defendant Scroll Compressors, LLC ("Scroll Compressors") is a Delaware limited liability that has its principal place of business in Sidney, Ohio.  Scroll Compressors is wholly-owned by Defendant Emerson Climate. During the Class Period, Scroll Compressors manufactured, marketed, sold and/or distributed Hermetic Compressors, either directly or through its subsidiaries or affiliates, to customers throughout the United States, including in the Commonwealth of Massachusetts.

35.    Defendants Emerson Climate, Copeland, CR, and Scroll are collectively referred to herein as "Emerson."

## DEFENDANTS AND CO-CONSPIRATORS

36.    Various other persons, firms and corporations, not named as Defendants herein, and presently unknown to the Plaintiff, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct as alleged herein.

37.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or

11

through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

38.    Each of the Defendants named herein acted as the agent or joint venture of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.  Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for Hermetic Compressors made by its parent company.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff also brings this action on behalf of himself and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all Class members.

40.    The Class is defined as follows:

> All consumers who purchased in the Commonwealth of Massachusetts for their own use and not for resale, Hermetic Compressors (either by themselves or as parts of other products) that were manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or co-conspirator thereof, at any time during the period from at least January 1, 1996 through the present. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local government entities.

41.    This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.    The Class is ascertainable and there is a well-defined community of interest among members of the Class;

b.    Based upon the nature of trade and commerce involved and the number of consumers of Hermetic Compressors in Massachusetts, the Plaintiff believes

that the number of Class members is very large, and therefore joinder of all Class members is not practicable;

        c.     The Plaintiff's claims are typical of Class members' claims because the Plaintiff purchased a product containing a Hermetic Compressor manufactured by Defendants or their co-conspirators, and therefore the Plaintiff's claims arise from the same common course of conduct giving rise to the claims of Class members and the relief sought is common to the Class;

        d.     The following common questions of law or fact, among others, exist as to the members of the Class:

            i.     Whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain, or stabilize the prices of Hermetic Compressors;

            ii.     Whether the combination or conspiracy caused Hermetic Compressor prices to be higher than they would have been in the absence of Defendants' conduct;

            iii.     The operative time period of Defendants' combination or conspiracy;

            iv.     Whether Defendants' conduct caused injury to the Plaintiff and the members of the Class;

            v.     The appropriate measure of the amount of damages suffered by the Class;

            vi.     Whether Defendants' conduct violates 93A;

e.    These and other questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages;

f.    The Plaintiff will fairly and adequately protect the interests of the Class in that the Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent it and the Class;

g.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision in a single court;

h.    In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

## THE HERMETIC COMPRESSOR MARKET

42.    Hermetic Compressors are devices, sealed in a welded steel casing, that utilize a piston-like mechanism to compress refrigerant gases.    When the compressed gas moves through the other components of the refrigerant system and is permitted to expand, it removes heat from its surroundings, producing a cooling effect that forms the basis for a variety of refrigeration and air conditioning products.

43.    Hermetic Compressors constitute approximately 94% of all compressors and compressor units (except automotive open compressors) sold in the United States. Tecumseh, the amnesty applicant in the United States, European Union and Brazil, manufactures and sells only Hermetic Compressors.    Danfoss was the leading seller of Hermetic Compressors in the United States during the Class Period.

44.    The Hermetic Compressor industry is a multi-billion dollar industry.    Total sales of compressors in the United States during the Class Period were about $36 billion.

45.    Hermetic Compressors are used in a variety of consumer, commercial, industrial and residential applications.    Hermetic Compressors with a lower British Thermal Units ("BTUs") output (200-1,500 BTUs) are used for household refrigerators and freezers as well as commercial refrigeration applications like ice makers, vending machines, food service and laboratory equipment, supermarket display cases and walk-in refrigerators and freezers.    Hermetic Compressors with larger BTU outputs (5,000-72,000 BTUs) are typically used in stationary and mobile air conditioning and refrigeration applications for large scale commercial, residential and industrial applications.

46.    Hermetic Compressors are often sold as stand-alone products, which are then incorporated as components of refrigeration and cooling machines by the manufacturers of those machines.

47.    The structure and characteristics of the Hermetic Compressor market in the United States are conducive to price-fixing agreements, and have made collusion particularly attractive in this market.

48.    Hermetic Compressors are homogenous, commodity-like products, and one Defendant's Hermetic Compressor can easily be substituted for a Hermetic Compressor manufactured by another Defendant.   For example, "Compressor Cross-Reference" guides showing the interchangeability of one Defendant's Hermetic Compressor with compressors offered by other Defendants are available on the websites of several of the Defendants, including Danfoss and Tecumseh.   The commodity-like nature of Hermetic Compressors is also demonstrated by the significant aftermarket for replacement Hermetic Compressors in the United States; an aftermarket in which most Defendants participate. Because Hermetic Compressors are commodity-like products, purchasers make purchase decisions based largely, if not entirely, on price.

49.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

50.    Defendants are horizontal competitors, meaning that they sell at the same wholesale or retail level of the distribution chain.   This makes it easier to monitor adherence to pricing agreements entered into by the cartel.

51.    The market for Hermetic Compressors is highly concentrated. Defendants here comprise the small number of producers that control a major share of the market, both globally and in the United States. This concentration makes the market conducive to price-fixing.

52.    Defendants as a group have held a stable and dominant position in the Commonwealth of Massachusetts market throughout the Class Period. For instance, Tecumseh has identified the same five manufacturers, in addition to itself, as the major manufacturers of commercial and household refrigeration compressors in the United States its 10-K filings since at least 1996 (the beginning of the Class Period).

53.    Throughout the Class Period, Defendants possessed market power to raise prices above competitive levels in the market for Hermetic Compressors in the United States.

54.    There are substantial barriers that preclude or reduce the entry of new manufacturers into the Hermetic Compressors market. A new entrant would incur costly and lengthy start-up costs, including multi-million dollar costs associated with investing in manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships.

55.    Demand for Hermetic Compressors is highly inelastic, in that there are no close substitutes for these products. Inelastic demand is a market characteristic that facilities collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

56.    A significant amount of the Hermetic Compressors used in finished products are sourced from production facilities located outside the United States. For

example, in a 1997 submission to the Federal Trade Commission regarding the propriety of labeling refrigerators "Made in USA" despite containing compressors produced outside the United States, Defendant Whirlpool stated that "the FTC should also know that the U.S. refrigerator industry MUST source a significant percentage of its compressors from abroad since there is insufficient domestic production of these parts" (emphasis in original). Defendant Whirlpool went on to argue that if the FTC implemented rules barring refrigerators containing foreign-sourced compressors from being labeled as "Made in USA," "much of the U.S. refrigeration industry will be disqualified from making 'Made in USA' claims."

57.    A number of Defendants, including Danfoss, Embraco N.A., Panasonic N.A., and Tecumseh, are members of the Air-Conditioning, Heating and Refrigeration Institute ("AHRI"), an Arlington, Virginia-based trade association.  The AHRI holds regular quarterly and annual meetings at locations throughout the United States. These regularly-scheduled trade association meetings provide an opportunity for participants in price-fixing conspiracies such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

## PRICING PATTERNS INDICATING A PRICE-FIXING CONSPIRACY

58.    Plaintiff is informed and believes, and thereon alleges, that Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to fix, raise, maintain and/or stabilize the prices at which they sold Hermetic Compressors to artificially inflated levels from at least January 1, 1996 through the present.

18

59.    Defendants' collusion is evidenced by unusual price movements in the compressor market during the Class Period.   Given that Hermetic Compressors constitute approximately 94% of all compressors and compressor units (except automotive open compressors) sold in the United States, overall compressor pricing is relevant to show pricing of Hermetic Compressors.

60.    As further detailed below, according to producer price increase data released by the U. S. Department of Labor's Bureau of Labor Statistics, compressor pricing between December 2003 and September 2008 has been characterized by disproportionate increases in average prices; in stark contrast to average price increases for analogous products in similar markets over the same time period.   The substantial nature of the price increases and the upward trend in which the prices have moved is indicative and characteristic of the existence of a price-fixing conspiracy amongst Defendants.

61.    As an example, from December 2004 to January 2005, compressor prices in the United States rose on average by 9 percent.   In contrast, prices in the United States for HVAC and commercial refrigeration equipment increased only 1.5 percent, and prices in the United States for all machine manufacturing increased by only 0.7 percent.   This one-month increase in compressor prices was 7 times larger than any one-month increase in prices for all machine manufacturing and 5.3 times larger than any one-month increase in prices for HVAC and commercial refrigeration equipment between December 2003 and September 2008.   Such a large increase in price over a single month, which is inconsistent with the pricing of similar products like HVAC and commercial refrigeration equipment and machine manufacturing, is indicative of and characteristic of a price-fixing conspiracy involving Defendants.

62.    Similarly, from September 2006 to January 2007, compressor prices in the United States increased on average by 7.6 percent.   In contrast, U.S. prices for HVAC and commercial refrigeration equipment increased on average by only 1.9 percent, and prices for all machine manufacturing increased on average by only 1.5 percent.

63.    Likewise, from December 2007 to September 2008, compressor prices increased on average by 9.5 percent. Whereas, prices in the United States for both HVAC and commercial refrigeration equipment, and for all machine manufacturing, increased only 5 percent on average.

64.    Overall, from December 2003 to September 2008, prices in the United States for compressors increased on average by 35 percent. For the same period, prices in the United States for HVAC and commercial refrigeration equipment increased only 26 percent, and prices for all machine manufacturing equipment increased on average by only 19 percent. Therefore, the average increase in compressor prices during this time period was 85 percent higher than the average price increase in all machine manufacturing, and 34 percent higher than the average price increase in HVAC and commercial refrigeration equipment.

65.    These disproportionate price increases in the average price for compressors are indicative of collusion in the Hermetic Compressor industry because the three industries on which this comparative analysis is based operate under similar economic conditions. Specifically, these industries use similar raw materials, have similar production processes, are subject to comparable labor costs, and operate on a similar scale. Consequently, the Bureau of Labor Statistics includes the data for the compressor industry

20

within that for the HVAC industry, and the data for the HVAC industry within that for all machinery manufacturing.

## GOVERNMENT INVESTIGATIONS

### The United States

66.    On February 19, 2009, the DOJ confirmed that it was investigating "anti-competitive practices in the compressor industry" in cooperation with international antitrust authorities.

67.    Defendants Whirlpool and Tecumseh have confirmed that they received grand jury subpoenas from the Antitrust Division of the DOJ.   Defendant Tecumseh stated that the investigation was "related to a pricing issue."

68.    Defendant Danfoss has also stated that "several of Danfoss' companies in the USA were visited by the American competition authority," and noted that "the reason for the visits and the pending investigation is the suspicion of illegal pricing arrangements within the compressor market."

69.    On February 27, 2009, Defendant Panasonic Corp. confirmed that its U.S. subsidiary, Defendant Panasonic N.A. "has been contacted by the U.S. government about an investigation relating to compressor pricing."

### Brazil

70.    On February 17, 2009, Brazilian antitrust authorities and law-enforcement authorities conducted a series of dawn raids on the offices of a number of Hermetic Compressor manufacturers, as well as the residences of current or former officers of at least two of the Defendant companies located in the Brazilian states of Sao Paulo and Santa Catarina.

71.    Brazilian authorities confirmed that the raids in Santa Catarina and Sao Paulo were part of a coordinated international investigation involving European and U.S. antitrust regulators into a global cartel which had been in existence for at least 12 years.

72.    The Brazilian raids came as part of an investigation which began in late 2008, when one of the participants in the Hermetic Compressor conspiracy-Defendant Tecumseh applied for leniency in three separate jurisdictions and provided information in connection with the activities of its co-conspirators.

73.    Statements issued by Brazilian authorities described the cartel's participants as having "agreed, through their managers, to fix price increases and also exchange commercial sensitive information." Regulators further disclosed that the conspiracy operated through email and telephone communications, as well as face-to-face meetings between the conspirators at hotels and restaurants.

74.    In a public filing on February 19, 2009, Defendant Whirlpool confirmed that its Brazilian subsidiary, Defendant Embraco, had been raided by Brazilian antitrust authorities.

75.    The Brazilian press has reported that, in addition to raiding Embraco's facilities, Brazilian antitrust and law enforcement authorities simultaneously raided the Sao Paulo apartment of Paulo F.M.O. Periquito – President of Whirlpool's Latin American operations from 1997 through 2007, and since 2007, the President of Whirlpool International – where investigators seized computers, laptops and documents.

76.    Defendant Tecumseh – who would later disclose that it had received amnesty from Brazilian authorities for admitting its role in the Hermetic Compressor cartel – confirmed in a statement on February 19, 2009 that it had received "a formal request for

information from the Secretariat of Economic Law of the Ministry of Justice of Brazil" related to its investigation of the compressor industry.

77.     The Brazilian press has reported that Brazilian antitrust and law enforcement authorities raided the Sao Carlos home of Gerson Verissimo, who was President of Defendant Tecumseh Brasil until 2008.

78.     Upon information and belief, Defendant Panasonic's Brazilian operations, based in the Brazilian state of Sao Paulo, were also raided by Brazilian antitrust authorities as part of an investigation into the Hermetic Compressor cartel as described herein.

**The European Union**

79.     The dawn raids by Brazilian authorities were followed shortly by surprise raids by the European Commission in Denmark, Germany, Austria and Italy.

80.     The European Commission issued a statement following the raids confirming that the "Commission has reason to believe that the companies concerned may have violated EC Treaty rules on restrictive business practices ...which prohibit practices such as price fixing and customer allocation."

81.     Defendant Danfoss confirmed that its headquarters in Nordborg, Denmark, as well as its primary compressor manufacturing facility in Flensburg, Germany, had been raided by the European Commission.

82.     Defendant Whirlpool similarly confirmed that its Italian subsidiary, the headquarters of the company's European operations, was raided by the European Commission.

83.     Upon information and belief. Defendant ACC's Italian headquarters and Austrian compressor factory were also raided by the European Commission

**Defendant Tecumseh's Amnesty Agreement**

84.    On February 23, 2009, in a memorandum from President and CEO Ed Raker to all employees, Defendant Tecumseh disclosed that:

> In mid-2008, we were made aware of certain activities that appeared to have occurred in prior years that did not appear to conform to our policies and standards of ethical conduct. Upon discovering these acts, the Company commenced an internal investigation led by independent outside counsel and directed by the Audit Committee of the Board of Directors. We also promptly brought the matter to the attention of authorities, and we have been cooperating with them in further information gathering. As a result of this action, we entered into amnesty agreements in the U.S., Brazilian and European jurisdictions. These agreements, which are conditioned on factors that include our continued cooperation with authorities, should protect the company from governmental fines and penalties that could result if the reported conduct is found to violate applicable law in such jurisdictions.

85.    On February 26, 2009, Defendant Tecumseh further disclosed that former President, CEO and Director Todd Herrick, and his son Kent Herrick, a current Board member and former Executive Vice President and Vice President of Global Business Development, "have not cooperated with the Company in its own investigation [of anti-competitive activities]," and "the Company believes that they have also refused to cooperate with the investigating antitrust authorities, despite the Company's request that they do so." The disclosure also noted that the conditional amnesty agreement that Defendant Tecumseh entered into with the U.S. DOJ on February 12, 2009 "specifically excludes Todd Herrick and Kent Herrick," who, in addition to their former employment with Tecumseh, also control a large proportion of the company's outstanding shares.

86.    To be granted amnesty from regulators in the U.S., Europe and Brazil, Defendant Tecumseh necessarily has admitted to its complicity in the conspiracy alleged herein, and has provided information to global competition authorities confirming the identities, roles and activities of its co-conspirators.

24

87.     According to DOJ guidelines, a corporate amnesty applicant must "admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will received a conditional amnesty letter.    A company that argues that an agreement to fix prices, rig bids, restrict capacity or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement, generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency.    A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency."

88.     Similarly, in order to be granted leniency by the European Commission-which can result in either total immunity from, or a reduction of, fines assessed for anti-competitive conduct-a company that participated in a cartel "must provide evidence that enables the Commission to prove the cartel infringement."

89.     To be granted leniency from Brazil's Ministry of Justice-Secretariat of Economic Law, an applicant must furnish authorities with an "admission of participation in the anticompetitive practices" and offer a "complete description of the anticompetitive practice, including the identification of the other participants and the respective individual roles."

## FRAUDULENT CONCEALMENT

90.     Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and the Class.

91.     Plaintiff and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the antitrust laws

as alleged herein until February 18, 2009, when the global investigation was first publicly reported.  Nor could Plaintiff and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  The conspiracy was by its nature self-concealing.

92.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Hermetic Compressors, which they affirmatively concealed, in at least the following respects:

a.    By meeting and communicating secretly to discuss prices and customers of Hermetic Compressors in the U.S. and throughout the world, including through email and telephone communications and at meetings in hotels, restaurants and trade association meetings;

b.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

c.    By giving false and pretextual reasons for their Hermetic Compressor price increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion.

93.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

## VIOLATIONS ALLEGED

### Plaintiff's Claim For Relief

### (Violation of Massachusetts G. L. c. 93A §2 et seq).

94.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

95.    Defendants' intentional and purposeful anticompetitive acts that are described above, including but not limited to acts of collusion to set prices and the actual act of price fixing itself, were intended to and did in fact cause Plaintiff and the Class members to pay supracompetitive prices for Hermetic Compressors (or products containing Hermetic Compressors) purchased in the Commonwealth of Massachusetts.

96.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 93A § 2.

97.    The violations of 93A by Defendants were done willfully, knowingly, and in bad faith.

98.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members of the   have been injured in their businesses and property in that they paid more for Hermetic Compressors (or products containing Hermetic Compressors) than they otherwise would have paid in the absence of Defendants' unlawful conduct.

99.    Demand has been made upon Defendants pursuant to 93A, §§ 2, 9 more than 30 days prior to filing this claim for relief under 93A.

100.    As a result of Defendants' and their co-conspirators' violation of 93A, Defendants are liable to Plaintiff and the Class for up to three times the damages that Plaintiff and the Class incurred, or at the very least the statutory minimum award of $25 per Hermetic

Compressor purchase (whether standing alone or as part of another product), together with all related court costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.    That the Court determine that the claims alleged herein under 93A may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes a violation of 93A;

C.    That Plaintiff and Class recover damages, as provided by 93A;

D.    That Plaintiff and the Class be awarded restitution, including disgorgement of profits obtained by Defendants as a result of its acts of unfair competition and acts of unjust enrichment;

E.    That the Court award Plaintiff and the Class it represents pre-judgment and post-judgment interest as permitted by law;

F.    That Plaintiff and the Class members recover their costs of suit, including reasonable attorneys' fees as provided by law; and

G.    That the Court award Plaintiff and the Class it represents such other and further relief as may be necessary and appropriate.

Dated: March 5, 2010

PA E. M

Robert E. Ditzion (BBO # 660962)
Charles E. Tompkins *(pro hac vice motion pending)*
Shapiro Haber & Urmy LLP
53 State Street
Boston MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134
E-mail:  rditzion@shulaw.com
           ctompkins@shulaw.com